## J. Fielding Martin v. Serena M. Martin, Samuel Beers, John O'Connor and Henry Wolseley, Executor ad Litem, etc.

1. RES ADJUDICATA—*As to Gifts—Administration of Estates.*— When a question has been finally decided in favor of a litigant it is afterward to be held as *res adjudicata* and not open to further discussion. (See 89 Ill. App. 147.)

Martin v. Martin.

2.  Presumptions—*That Services Rendered by Relatives Are Gratuitous.*—Where services are rendered either by or to one admitted into a family as a relative, the presumption of law is that such services are gratuitous and that the parties do not contemplate payment therefor, but this presumption may be overcome by proof of an express contract between the parties that payment is to be made therefor, or of facts and circumstances which show that both parties, at the time the services were rendered, intended pecuniary recompense other than that which arises out of the family relation.

3.  Gifts—*Revocable Until Executed.*—A gift is revocable until executed and a check intended as such from the drawer to the drawee is in reality merely a promise to make a gift and such gift is not executed until the check is paid.

Administration of Estates.—Error to the Circuit Court of Kendall County; the Hon. George W. Brown, Judge, presiding. Heard in this court at the October term, 1901. Reversed with a finding of facts. Opinion filed April 18, 1902.

N. J. Aldrich and Theodore Worcester, attorneys for plaintiff in error.

Robert L. Tatham and Henry S. Wilcox, attorneys for defendants in error.

Mr. Justice Crabtree delivered the opinion of the court.

This same case was before us at the April term, 1900, and will be found reported as Martin v. Martin in 89 Ill. App. 147. That was a writ of error filed by J. Fielding Martin, the present plaintiff in error, against Serena M. Martin, one of the present defendants in error, and her co-executors of the will of Edward Martin, deceased. We refer to the opinion filed in that case, for a more specific statement of the claim on which this suit is founded. In that case Serena M. Martin, one of the defendants in error in this case, had recovered a judgment for $62,080.02 against the estate of Edward Martin, deceased, which judgment was then reversed by this court for the reasons stated in the opinion then filed.

There has been heretofore considerable litigation between J. Fielding Martin, Serena M. Martin, and others interested in the estate of Edward Martin, deceased, which litigation has been before this court and the Supreme Court, and will

be found reported and fully discussed in Martin v. Martin, 68 Ill. App. 169, S. C., 170 Ill. 18; also Martin v. Martin, 74 Ill. App. 215, S. C., 174 Ill. 371. As this former litigation can not fail to have a strong bearing upon the rights of the parties in the present controversy, and has been frequently referred to and commented on by counsel in their briefs and arguments filed in this case, we deem it proper to refer to the opinions filed in the cases above mentioned, for a full statement and more detailed history of matters in evidence in the present record, and as to the relations which Edward Martin and Serena M. Martin bore to each other, as well as the circumstances under which she came to be a member of his family, in which she lived with him up to the time of his death, and also her companionship with and services performed for him by her during his life.

It may not be improper or unimportant to refer briefly to what was involved or litigated in those cases. Although Edward Martin had his home at Red Hook, New York, and died there, yet he also claimed a domicile in Kendall County, Illinois, where his will was filed for record and admitted to probate. Samuel Beers and John O'Connor having been named as executors and Serena M. Martin as executrix of the will, were duly appointed and qualified as such, and assumed the burden of executing the will. As such executors they filed an inventory of the property of the estate, showing real estate to the amount of $58,250 and personalty to the amount of $323,655.03. Subsequently, J. Fielding Martin (the plaintiff in error in this case), filed a petition in the County Court of Kendall County, in which he claimed that the executors, or some of them, had knowingly withheld from the inventory certain chattels and credits of the deceased; also praying a citation, and that an additional bond be required from the executors. After the case had reached the Circuit Court on appeal, Serena M. Martin filed an answer claiming title to and ownership of the securities withheld from the inventory, on the ground that they had been given to her by her uncle, Edward Martin, in his lifetime. It is unneces-

sary to set out the whole details of the litigation in that case, it being enough to say that by the determination of the Supreme Court it was held that she was the owner of the securities involved in that case as gifts from her uncle in his lifetime according to her claim of ownership. The securities then in dispute thus awarded to her by the Supreme Court amounted to about $180,000.

This first case has been referred to by counsel in the present case, as the " main case," and for convenience of reference we will hereafter so designate it.

In the second case, reported in 174 Ill. 371, the controversy was concerning two promissory notes once owned by Edward Martin, one for $5,500, executed by the Catholic Bishop of Chicago, and another executed by the Catholic Bishop of St. Joseph, Missouri, for $15,000. These notes also were claimed by Serena M. Martin as gifts to her by her uncle, Edward Martin, in his lifetime. By the decision of this court, which was affirmed by the Supreme Court, this claim of Serena M. Martin was sustained. Martin v. Martin, 74 Ill. App. 215; 174 Ill. 371.

The securities thus confirmed to claimant by the Supreme Court amounted to upward of $200,000, and by the testimony of Serena M. Martin in this case, it appears she had already received satisfaction of these judgments in her favor out of the personal estate of deceased, which personal estate we have seen from the inventory amounted to $323,655.03. While the testimony of claimant, as set forth in the abstract, is somewhat confused, we understand her to mean that in the first or " main case " she recovered $180,000, and in addition thereto, in the second case $20,500, which she says was " willed to her by the Supreme Court" for a lifelong service rendered to him (Edward Martin) and his sister (Serena M. Martin).

We can put no other construction upon this language than that she understood these securities were adjudged by the Supreme Court to be hers as gifts to her from her uncle, as compensation for the services rendered to him and her aunt, Serena, during the long years she had lived with

them. An examination of the cases in which these judgments were made in favor of claimant will show, we think, that not only this court, but the Supreme Court, were largely influenced by the evidence as to the affectionate relationship of the parties. The fact as then understood, that claimant had gone into the family of her uncle, Edward Martin, when a child only nine years old, and had faithfully served him for some forty years or more, in the capacity of servant, housekeeper, nurse and companion, and had become broken in health in consequence, furnished a strong argument in favor of the gift theory. From what appeared in those cases, there was every reason to believe that Edward Martin intended to make ample provision for her support and maintenance after he should be called away, and hence the real questions involved in the former cases were as to whether there had been such a delivery of the securities then in controversy, and such a surrender of control over them by the donor, as to constitute them valid gifts *inter vivos*.

Those questions having been decided in favor of Serena M. Martin, must now be held as *res adjudicata*, and are not open to further discussion. But while this is so, we can not entirely shut our eyes to this former litigation and its results, especially as the testimony in this case is intimately connected with that given in the former cases, and has been frequently referred to in the cross-examination of witnesses and in the arguments of counsel in the case now before us. Of course, in the decision of this case, we are to be governed only by the evidence appearing in the present record, which we will now proceed to consider.

After the case reached the Circuit Court of Kendall County upon the remanding order of this court, the cause was again tried by a jury, who returned a verdict in favor of the claimant for $62,080.02, "with interest at five per cent," without computing the interest. The jury were sent back to their room by the court with instructions to compute the interest and include it in their verdict if they found for the claimant.

Thereupon the jury retired, and afterward returned their verdict in favor of claimant for $83,367.73.    A motion for a new trial having been overruled, judgment was entered on the verdict, to reverse which J. Fielding Martin prosecutes this writ of error.

When this case was formerly before us, we reversed the judgment in favor of claimant, on the ground that the evidence did not establish a cause of action in her favor.    We there say :

" There was no special verdict.    But as the verdict is for the precise amount of the face of the checks claimant offered in evidence, including even the two cents on one check which she omitted from the claim as filed, it is plain the jury found for claimant upon the checks, and found against her as to all other demands."

This language is equally applicable to the case as it now stands.    The verdict, as first returned by the jury, was for $62,080.02, which was the precise amount of the three packages of checks put in evidence.    We are therefore fully warranted in finding that the verdict was based entirely upon these checks, and that all other items of the claim were disallowed by the jury.

In our former opinion we approved the action of the jury on the former trial, so far as it applied to the items of claim other than the checks, and as to those items we think they properly found the same way upon the last trial.    What we then said on the subject we think is equally applicable now, and we adhere to the opinion then expressed.

The only question, then, left for discussion, is whether the verdict of the jury for the amount of the unpaid checks, and the interest thereon, can be sustained upon the evidence now appearing in the record.    It is clear to us that unless there was evidence introduced and admitted upon the last trial, which will show a different state of facts in regard to these checks, and the consideration therefor, than appeared in the former record, claimant is in no better situation now than she was then.

We deem it unnecessary to again discuss the law applicable to cases of this character.    We think it was properly

laid down in our former opinion, and the propositions we there discussed are not seriously controverted. Counsel for defendants in error in their argument in this case say our "former opinion herein was based upon the notion that all the services that were rendered by claimant for the deceased were rendered by her as a member of his family, without any contract, express or implied, for any compensation therefor. The case was remanded for a new trial, and much new evidence has been taken for the purpose of satisfying the jury and your Honors that the claimant's services were rendered under the mutual agreement and expectation of herself and the decedent, that she should be pecuniarily compensated therefor."

It is true there has been some new evidence on this subject, but in our view it makes very little difference as to the situation and relation of claimant and Edward Martin to each other, from what appeared in the former cases. It now appears that Edward Martin did not become the entire owner of Red Hook until about the year 1854, and did not fully make it his home there until that time. Claimant had then been living there since 1847 with her aunt, Serena, and at the latter's request. In 1854, when Edward Martin became the owner of Red Hook, and from which time he made it his home, the claimant was seventeen or eighteen years old, according to the testimony of her sister, Isabella F. Martin. Claimant continued to live in the family with her aunt, Serena, and her uncle, Edward Martin, after he came there (the aunt being the housekeeper) until the death of the latter, which occurred December 24, 1877. There is some conflict in the evidence as to the amount and character of the services performed by the claimant in the family of her aunt and uncle up to the time of the death of the former, some witnesses testifying that she did only the work usually done by a farmer's daughter, and others giving it a more laborious characterization. The evidence on the last trial shows that "Aunt Serena," upon her deathbed, enjoined it upon Edward Martin to provide well for Serena (meaning claimant), and he said he would.

Martin v. Martin.

After the death and funeral of "Aunt Serena" witnesses swear to an occasion when they saw Edward Martin place his arms around claimant, saying: "I don't want any more changes; I want you to stay with us and take your aunt's place." Serena said she would. Mrs. Ann Jaques, a sister of claimant, also testified to a conversation of similar import between Edward Martin and claimant the day of the aunt's funeral. We quote from her testimony, as follows:

"Aunt Serena died September 24, 1877. I heard a conversation between Edward Martin and Serena M. Martin. After the burial of Aunt Serena—it was the same day—she was sitting there and she said that her aunt was dead, and Julia said that now her aunt was dead she could come home. He said, 'This is your home. I don't want any more changes. I can do better for you than you can do for yourself, and I want you to take your aunt's place and attend to everything as she did in her lifetime.' Q. 'Did he say anything about compensating her?' A. 'Yes, he said he would compensate her as he saw fit. He said he wanted her to stay there and take her aunt's place and attend to everything, and he said it was her aunt's home, and he would compensate her, so that she told him that she would stay with him; she would not leave him. She stayed there, and I saw her frequently afterward. The routine of her daily work was starting the fire in the morning, getting breakfast, taking care of the house, doing the cooking, and all such work in the house, and besides there was always some out-door work to do. She would go out and work in the garden. The last few years she did not do any milking. She did not milk after her aunt's death. She had charge of the household. * * * Serena M. began going South with him in the fall of 1890 or 1891. He was getting feeble, and he wanted some one to take care of him if he got sick. He had always had a cousin who went South with him until he died. Richard Martin was his name. I think he died in January, 1890.'"

We have quoted thus largely from the testimony of this witness, because, being a sister of claimant and seeing her frequently, she appears to have been at least as familiar with the condition of things at Red Hook, and the relations of Edward and Serena M. Martin, as any of the other wit-

nesses. This conversation between claimant and her uncle after "Aunt Serena's" death seems now to be relied upon by counsel for complainant as showing an agreement or special contract on the part of Edward Martin to compensate Serena M. for the services she might thereafter render to him. As to that portion of this testimony concerning a promise of decedent to "compensate" claimant for staying with him, it is additional to that appearing in the record when the case was here before, although testimony as to the same interview has been introduced in the former litigation between these parties. In the former cases this class of testimony seems to have been introduced to show the tender and affectionate relations existing between Edward Martin and this claimant, to account for the large gifts he bestowed upon her. At the last trial it appears to have been introduced to sustain the theory of claimant that there was a promise to pay her for her services and thus show a consideration for the checks. In our former opinion filed herein, when stating the law applicable to the case as then presented, we said:

"Where services are rendered either by or to one admitted into the family as a relative, the presumption of law is that such services are gratuitous, and that the parties do not contemplate payment therefor. This presumption may be overcome by proof either of an express contract between the parties that payment shall be made therefor, or of facts and circumstances which show that both parties, at the time the services were rendered, intended pecuniary recompense other than that which arises out of the family relation. (Heffron v. Brown, 155 Ill. 322.) There is no express contract for payment in this case. We find no evidence in this case showing that Serena M. Martin expected to charge her uncle for her services or that Edward Martin ever looked upon himself as under legal obligations to pay her or ever intended to pay her."

Now, unless it can be reasonably said that the conversation between Edward Martin and claimant, the day of "Aunt Serena's" funeral, constituted a legal contract for compensation, or an agreement on the part of decedent to pay claimant for services thereafter to be rendered to him

by her, there is nothing in the present record which renders the above language used by us inapplicable to the facts of the case as they now appear.  It becomes important, therefore, to carefully examine what was then said, the circumstances under which it was said, and by putting ourselves as nearly as possible in the place of the parties, to ascertain what they intended by what they said.  Although claimant was at that time about forty years old, it must be remembered that she had been a member of the family living at Red Hook ever since she was about nine years old.  Whether "Aunt Serena" or Edward Martin was the head of the family when claimant first went there, or whether she became a member of the family at the request of one or the other, in our view, makes little difference.  She had at all events been a member of the family of Edward Martin at least since 1854, a period of twenty-three years.  She had been treated by her uncle more as a daughter than as a servant. She had arrived at the age of maturity and no doubt was capable and competent to take her aunt's place as housekeeper.  Her ways were known to her uncle and his to her. Edward's sister, Serena, the aunt of claimant, was dead, and if she should then leave, as was suggested, the family would be broken up, and Edward Martin left without a home. He was getting along in years and would naturally shrink from such a condition of things and desire to avoid such a radical change.  Hence his appeal to his niece to stay with him.  Aunt Serena had asked him to provide well for Serena M., and he promised her he would.  So in this conversation, after the burial of "Aunt Serena" which the witnesses have detailed, he affectionately put his arms around claimant and said : " This is your home; I don't want any more changes.  I can do better for you than you can do for yourself, and I want you to take your aunt's place and attend to everything as she did in her lifetime." The witness testifying to this scene and conversation, having here stopped, was asked this direct question : Q.  "Did he say anything about compensating her ?" and answered as follows: " A.  Yes; he said he would

compensate her as he saw fit;" and thereupon the evidence of the witness is, that claimant told him that she would stay with him; that she would not leave him.

In the light of all the surrounding circumstances, what was the intention and understanding of the parties by the conversation thus detailed? Edward Martin was rich; the claimant was poor. He knew that he could, out of his abundance, do much better for her than she could do for herself. Undoubtedly claimant understood and appreciated that fact. Long years of association and intimate acquaintanceship with him caused her to know she could trust him and was willing to do so. When he said he would compensate her as he saw fit she was willing to accept his promise and judgment as to what would be right. But does any one suppose that he intended to contract with claimant to pay her as a mere servant for such services as she might thereafter render to him, or that claimant understood the conversation in any such sense? We think not. Certainly we have been unable to come to any such conclusion, and in our judgment the evidence falls far short of establishing an express contract on the part of Edward Martin to pay, in a legal sense, for the services to be thereafter rendered to him by the claimant. We can not see that the evidence in this record in any material degree strengthens the right of claimant to recover upon the checks in controversy. We still adhere to the opinion that the checks as mere gifts, give the claimant no cause of action against the estate of the decedent. Conceding that the execution and delivery of the checks imported a valuable consideration, as a presumption of law, still, as we said in our former opinion, this presumption is not at all conclusive, but will yield to the facts disclosed by the evidence. We think the facts and circumstances in evidence in this case destroy the presumption above mentioned. All the evidence considered, we can come to no other conclusion than that the checks were drawn by Edward Martin with the intention of making a gift to the claimant of so much money as was thereby represented. But a portion of the checks not hav-

ing been presented for payment before the fund had been withdrawn by Edward Martin, and the remainder not having been paid or presented for payment during the lifetime of the drawer, all cause of action thereon is lost to the claimant. It is strongly argued by counsel for claimant that Edward Martin had the right to estimate for himself the value of her services to him, and that if he saw fit to pay her by way of these checks for her services he had a right to do so. But if we concede this proposition to be true, we fail to see how it places claimant in any better position. This would not change the character of the checks from mere gifts to legal liabilities. It must be remembered that the fact of delivery of many of these checks depends upon the same evidence as that relied upon to establish a delivery of the securities in controversy in the former litigation between these parties, as gifts, and in which claimant, as we have seen, has already had awarded to her upward of $200,000 out of the personal estate of the decedent. In all this litigation claimant has relied upon the evidence as to her services to Edward Martin, as a reason for his large gifts to her. If in his attempts to further enrich her by way of these checks he failed to accomplish his object it is claimant's misfortune that the matter was not placed in such shape as to effectuate his intention. But in our view of the case the checks represent nothing more than an intention on the part of Edward Martin to give so much money to the claimant. As to those which came to her possession and knowledge during Edward Martin's lifetime, she failed to present them for payment and thereby lost the benefit of the intended gift. As to those which came to her possession after his death, they simply amounted to an unexecuted gift. Had these checks been drawn by Edward Martin as payment for a debt owed by him as a legal liability, we think the evidence shows him to have been too good a business man, and indeed, too honest a man, to have withdrawn the funds from the banks in which they were deposited and upon which the checks were drawn.

It is quite clear, from the evidence, that claimant did not

know or suppose, during the lifetime of her uncle, that
there was within her power or control, such a large amount
of money as is represented by these checks.    There is con-
siderable testimony in the record, of statements made by
claimant after her uncle's death, concerning the financial
situation in which he had left her.    According to her state-
ments, testified to by a number of witnesses, she seemed to
think the only property she had was the farm, Red Hook,
which she thought was not self-supporting, and that he had
left her that and nothing with which to carry it on; that
he had intended to draw her some checks and had not done
so; that she was too poor to give a present at the golden
wedding of her uncle and aunt, etc., etc.    Evidently she
had no knowledge at that time that her uncle had made
her a rich woman, or that she had this large claim against
his estate.    From a careful consideration of all the evidence
in the case, and the circumstances appearing in the evidence,
we are forced to the conclusion that claimant has failed to
make out a cause of action on account of services rendered,
which, it is argued, was the consideration for these checks.
She had received, by way of gifts from her uncle, a deed of
the Red Hook farm, said to be worth about $20,000, and in
notes, bonds and securities about $200,000, making in all
about $220,000.    Few men in a lifetime of labor and stren-
uous effort succeed in accumulating a fortune of that
amount.    In addition she is to receive as one of the resid-
uary legatees under the will two-fortieths of the remainder
of the estate.    We think Edward Martin has provided for
claimant in a liberal and munificent manner by these gifts,
which gifts he made to her because she had rendered these
services to him.    We are of opinion her present claim of a
legal liability against decedent's estate for her services can
not be reconciled with the theory upon which these large
gifts to her have been heretofore sustained.    It is not con-
ceivable that he would have made her these large gifts
because of her services, if he understood he was also under
a legal liability to pay her for the same services.    By his
will it appears there were other objects of his bounty to

Martin v. Martin.

whom he had in mind to make some bequests, and for whom there would be little left if claimant, in addition to the $200,000 of personal estate she had already received, now succeeds in recovering this judgment for $83,367.63. True, Edward Martin had the right to dispose of his fortune as he pleased, and these remarks are only made as bearing upon the understanding and intentions of the parties as to the alleged legal liability to pay claimant for her services to him.   In our former opinion in this case, when referring to these gifts involved in the former litigation and their bearing upon the present case, we said:

" She then claimed these were gifts, and she there proved her services to deceased to show a reason why he would be likely to bestow such a generous bounty upon her, and why he must have felt affection for her, and sought by the moral force of such facts to induce the courts to hold said securities were gifts to her, completely executed in her lifetime. Having obtained judgment that the bond, notes and mortgages were hers by gift, she now sets up a legal liability of Edward Martin to pay her for the same services as a valuable consideration for the checks which she failed to reduce to cash in his lifetime.   We do not think her services to Edward Martin capable of performing this double duty."

We are still of the same opinion and see no reason for departing from the language then used.

As to the other items of the claim, perhaps we have already said all we need to say in reference thereto.   Evidently the jury allowed nothing thereon, and found a verdict only for the amount of the checks and interest.   We approve this action of the jury as to said other items for the reasons given in our former opinion, there being no new evidence as to these items except a stronger showing of admissions by claimant that she had received all the interest collected by Edward Martin on securities which he had previously given her.

Without further extending the limits of this opinion, we conclude that the verdict is not supported by the evidence, and the judgment will be reversed, but the cause will not be remanded.

**Finding of facts** to be made a part of the judgment:

We find as a fact that there was no legal or valuable consideration for the checks offered in evidence and upon which we find the verdict of the jury was based.

We further find as a fact that there was no contract between Edward Martin and the claimant, either express or implied, for services rendered or to be rendered by the latter to the former; that the promise of Edward Martin to claimant to "compensate her as he saw fit" was not understood by the parties as constituting a legal contract to pay, and was not so acted upon by them, but was only understood as expressive of an intention on the part of Edward Martin and an expectation on the part of the claimant that Edward Martin would, out of his fortune, do better by claimant in a financial sense than she could do for herself.

We further find as a fact that as to moneys which Edward Martin collected upon bonds or other securities which he had previously given to claimant, either for principal or interest, he had fully repaid her therefor by the gifts to her of other securities of greater value in place of the securities themselves, and by the giving of checks for the interest collected, to a greater amount than he had received, said checks being other checks than those involved in the present suit.

We find as a fact that she has frequently admitted that she had received all the interest collected by him upon her securities and that in fact that is true, and she has now no legal claim against his estate therefor.